Filed 10/3/16  Mako Investments v. West Coast Contractors of Nevada CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| MAKO INVESTMENTS, LLC, | C073867 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV29252) |
| v. | |
| WEST COAST CONTRACTORS OF NEVADA, INC., | |
| Defendant and Appellant; | |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | |
| Defendant and Respondent. | |
| WEST COAST CONTRACTORS OF NEVADA, INC., | |
| Cross-complainant and Respondent, | |
| v. | |
| ZEPHYR COMPANIES, INC., | |
| Cross-defendant and Appellant. | |

1

A $2.6 million erosion control project with a $1.8 million stream restoration component at Lake Tahoe for Placer County (County) resulted in litigation between the general contractor and the subcontractor on the project over compensation for work performed. Defendant and appellant/cross-complainant and respondent West Coast Contractors of Nevada, Inc. (West Coast), served as general contractor. Defendant and respondent Fidelity and Deposit Company of Maryland (Fidelity) issued West Coast's payment bond. Cross-defendant and appellant Zephyr Companies, Inc. (Zephyr), served as subcontractor. Zephyr assigned its claims in the litigation to plaintiff and appellant Mako Investments, LLC (Mako).

Following a flurry of complaints and cross-complaints, a jury returned a verdict in favor of Mako and Zephyr in the amount of $915,045 in compensatory damages and $638,422 in punitive damages, for a total of $1,553,467 in damages against West Coast. On posttrial motions, the trial court reduced compensatory damages by $695,000 and eliminated all punitive damages, for a damages award of $220,045. In addition, the court awarded prompt payment interest penalties and 35 percent of the attorney fees and costs requested. Zephyr and Mako appeal, seeking reversal of the court's reduction in damages, restoration of the jury's award, reversal of the attorney fees and costs award, and reversal of the prejudgment interest award. West Coast cross-appeals, challenging the trial court's statutory interpretation and jury instructions. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties

Zephyr is a contractor specializing in earthwork. Until August 9, 2008, Steven Cruz owned 50 percent of Cruz Excavating, Inc. (Cruz Excavating), which in 2009 formally changed its name to Zephyr. Scott Freidus was Zephyr's president.

2

Mako is an investment management company. Zephyr assigned its claims to Mako, its creditor, since Zephyr did not have the resources to pursue the claims.

West Coast as a general contractor specializes in putting together a team of subcontractors in order to manage and complete construction projects. Mario and Andrew (Andy) Ramirez are the owners as well as the president and vice-president, respectively, of West Coast.[1]

Fidelity issued West Coast's payment bond.

**The Project**

In 2009 the County solicited bids for the Lake Forest Erosion Control Project (Project). The Project's goal was to reconstruct a native stream bed. The stream restoration sought to mitigate erosion and other damage caused by development along the stream bed.

The project was subject to regulations of the Tahoe Regional Planning Agency (TRPA), which required work on the Project to stop between October 15 and May 1 each winter.

**Bidding Process**

The parties disagree on how the contract for the Project was awarded. West Coast contends its superintendent, Mark Rosa, found the Project on the Reno Builders Exchange and the company ultimately submitted a bid. Around this time Andy and Freidus began discussing the Project. Since Zephyr lacked the qualifications to submit as general contractor, Freidus offered to team up with West Coast and serve as a subcontractor. Mario and Freidus met prior to preparing the bid. Payments from contracting agencies may lag for several months after the performance of labor, so Freidus stated he would need help funding payroll; Mario knew by then that Zephyr

---

[1] Since Mario and Andy Ramirez share the same last name, we will refer to them by their first names.

could not post payment and performance bonds. Mario was not concerned because the inability to obtain subcontractor bonding is not necessarily indicative of poor financial stability. Mario, who had previously advanced payroll for other subcontractors, agreed to do the same for Zephyr even though it was not required by the subcontract.

Freidus was in the room while West Coast prepared its bid on the Project, a practice which helped in improving bidding accuracy. West Coast never formed a joint partnership or joint venture with Freidus or Zephyr. Freidus never requested such a partnership. A joint partnership or joint venture with a subcontractor would violate the terms of West Coast's bond. None of the Project documents refer to Zephyr as a partner or to the Project as a joint venture.

In contrast, Freidus testified Zephyr usually bids projects as a general contractor. West Coast lacked the experience and expertise Zephyr possessed. However, due to financial difficulties, Zephyr could not obtain the necessary bonds and lacked the working capital necessary to fund the job. Therefore, Zephyr brought the project to West Coast.

Zephyr informed West Coast that Zephyr's financial difficulties prevented it from both obtaining a bond and possessing the working capital to undertake the Project as the general contractor. The parties agreed to team up together to win the Project, with West Coast bidding the Project as general contractor. This "teaming" reflected the parties' fiduciary relationship, a relationship that existed in addition to a joint venture relationship and partnership relationship. Prior to bidding on the project Zephyr and West Coast exchanged confidential, proprietary cost data concerning specific items in the bid. According to both Freidus and Andy, in a typical subcontractor/general contractor relationship, only final prices on items would be exchanged, not underlying cost data.

Zephyr states it determined how to bid on every single item in the bid, not just items it was responsible for but also West Coast's work and that of other subcontractors. In addition, Zephyr was the only subcontractor present in West Coast's "war room."

4

In August 2009 West Coast submitted a bid for $2,595,958.75 to complete the Project. The County awarded the project to West Coast, with Zephyr as the earthwork/utilities subcontractor. After the award, West Coast secured Project bonding and signed a contract with the County. West Coast did not require Zephyr to obtain a bond; Fidelity posted a bond guarantying West Coast's obligation to Zephyr.

**The Subcontract Agreement**

In September 2009, before work on the Project started, West Coast sent Zephyr a written subcontract agreement. Again, the parties disagree on subsequent events.

West Coast states Zephyr did not object to the agreement on the ground that it was a partner or joint venturer with West Coast. Instead, Freidus put aside the agreement and Zephyr began work. Freidus, after work began, mentioned in passing to West Coast's project manager's assistant that there were problems with the subcontract that needed to be discussed. However, Freidus never discussed his concerns or proposed an alternative agreement. Zephyr continued work on the project.

At trial, Andy testified West Coast never agreed to provide working capital to Zephyr or to create a relationship beyond that of contractor/subcontractor. Andy believed the written subcontract agreement constituted the agreement between Zephyr and West Coast for the Project.

Zephyr acknowledges that West Coast sent it a subcontractor agreement in September 2009. However, Zephyr contends the proposed form varied from and conflicted with the parties' "teaming agreement." The proposed form required Zephyr to post bonds and provided for termination based on financial condition and failure to provide bond. Therefore, Freidus did not sign the document and notified West Coast about the problems with it. Neither party signed the document.

**Substitution of a Subcontractor**

Central to the dispute between the parties is the Subletting and Subcontracting Fair Practices Act (Act; Pub. Contract Code, § 4100 et seq.), which requires County approval

5

for substitution of a subcontractor on a public works contract.[2] The Act provides, in part: "Prior to approval of the prime contractor's request for the substitution, the awarding authority, or its duly authorized officer, shall give notice in writing to the listed subcontractor of the prime contractor's request to substitute and of the reasons for the request. The notice shall be served by certified or registered mail to the last known address of the subcontractor." (§ 4107, subd. (a)(9).) It is the final sentence that provides the bone of contention between the parties.

**Work Begins**

Zephyr began work on the Project without a bond and without signing West Coast's subcontractor agreement. The Project is inside the Lake Tahoe Basin and subject to TRPA regulations. Under these regulations, the Project was shut down between October 15, 2009, and May 1, 2010.

Zephyr worked on the Project from September 16, 2009, through October 15, 2009, the winter shut-down date. Dissatisfied with Zephyr's performance, West Coast sent Zephyr a "48-Hour Notice to Cure," requiring the subcontractor to adequately supervise the Project. Once again, the parties disagree strongly about what followed.

**Zephyr's Version of Events**

Zephyr contends West Coast's complaints were resolved prior to winterization, and both the County and West Coast approved its work. The Project was on schedule. The County paid West Coast $249,741.28 and $67,445.95 for the work Zephyr performed. The total value of Zephyr's work was $317,187.23.

According to Zephyr, West Coast withheld funds from Zephyr despite being aware of the potential harm to Zephyr. West Coast never made any payment to Zephyr other than advances for net payroll. Zephyr repeatedly urged West Coast to release some funds

---

[2] All further statutory references are to the Public Contract Code unless otherwise designated.

or pay some of its obligations. West Coast's refusal to reimburse Zephyr for work performed weakened the subcontractor's already shaky financial condition.

Freidus told Andy, one of West Coast's owners, that Zephyr would not be able to remain in business throughout the winter without any money coming in. Andy acknowledged that West Coast's withholding of money exacerbated Zephyr's financial condition.

After West Coast withheld Zephyr's progress payment, Zephyr could not pay its workers' compensation insurance premiums and the license bond lapsed. Zephyr was unable to pay for its general liability insurance and was sued by its fuel supplier for nonpayment. West Coast refused Zephyr's request that West Coast pay Zephyr's insurance premium.

Zephyr also asked West Coast to pay outstanding union contributions, and West Coast supplied two checks. According to Zephyr, West Coast later voided the checks and the union was not paid. West Coast failed to inform Zephyr, which incurred penalties and interest. Subsequently, the union sued Zephyr.

Prior to Christmas, Freidus asked Andy to release $10,000 of Zephyr's funds so employees could be paid before the holiday. Andy refused. Freidus laid off Zephyr's office staff.

West Coast paid some of Zephyr's debts. After deducting the amounts advanced to Zephyr, West Coast retained $194,146.87 of the money the County paid for work done by Zephyr. In addition, Zephyr spent $10,848 for an approved change order and $15,000 for equipment and materials at the job site from which Zephyr was excluded.

Mario admitted that the decision to withhold Zephyr's funds was not connected to the work Zephyr performed on the Project. West Coast did not give Zephyr any reason for withholding the money from Zephyr.

West Coast calculated the costs of terminating and replacing Zephyr and kept its calculations secret from the subcontractor. Based on those calculations, West Coast

7

made the decision to terminate Zephyr before December 2009. West Coast did not inform Zephyr of its decision to terminate the subcontractor.

West Coast led Zephyr to believe that it would allow Zephyr to finish work on the Project. Mario met with Freidus in February 2010. Mario encouraged Freidus to stop using union employees because the union rules created inefficiencies. Freidus told Mario that the only way Zephyr could cease its union involvement would be to file for bankruptcy and then form a new nonunion company. Zephyr considered bankruptcy only to satisfy Mario's desire to break the union contracts. Freidus believed West Coast had all the money and all the power.

Mario knew that Freidus was in the process of forming the new company. Freidus subsequently formed DM Excavating in February 2010 and applied for a contractor's license. Andy knew about the new company in March 2010.

During these conversations, West Coast never informed Zephyr that it had already decided to terminate the subcontractor. At the same time, West Coast was accepting bids from the company with which it eventually replaced Zephyr. Mario ceased communications with Freidus. The pair never spoke directly and Mario did not return Freidus's phone calls. Nor did Andy communicate with Freidus.

On March 4, 2010, West Coast notified Zephyr by letter that Zephyr's financial condition had become "unstable or unsatisfactory" and demanded "additional security, in the form of a bond approved by West Coast's bonding agent." Freidus believed the letter was a precursor to West Coast's transferring work to a nonunion subcontractor, DM Excavating. A week later, on March 11, 2010, West Coast sent a letter terminating the contract.

On March 17, 2010, Freidus sent Mario an e-mail stating "[e]verything is still as discussed. . . . [¶] . . . [¶] I have many of the same people coming back to do the work - they have agreed to work outside of the Union. . . [.]" After receiving no response, Freidus repeatedly telephoned West Coast, left messages, sent e-mails, and visited the

8

West Coast offices a couple of times a week. After receiving an e-mail from West Coast, Freidus called the West Coast office and was told Zephyr would not be allowed to finish the Project and someone else had been hired.

Zephyr contends that but for West Coast's withholding of payment for work performed, Zephyr's financial condition had improved from the beginning of the Project up until termination. According to Zephyr, its financial difficulties had been successfully addressed by March 2010. Zephyr had a receivable of about $265,000 for work performed on the Project. At trial, Freidus testified that had West Coast reimbursed Zephyr for the work performed, it "absolutely would have made it through the winter" as that amount "of liquid cash would have been probably more money" than Zephyr had had going into any of seven or eight other winters.

Prior to its termination, Zephyr had access to over $1 million dollars in equipment and additional financing from alternative capital sources. These sources, which included Mako, had loaned more than $700,000 over 10 years. Termination by West Coast meant these sources would not be able to make further loans. West Coast's refusal to allow Zephyr to finish the job and the withholding of payment for work performed extinguished any potential collateral Zephyr could have used to borrow funds.

On March 30, 2010, pursuant to section 4107, West Coast wrote to the County informing it that Zephyr would no longer be a subcontractor and stating that Zephyr would be substituted with Marv McQueary Excavating (McQueary). West Coast did not inform Zephyr of its intentions, nor did it forward a copy of the letter. West Coast cited "Public Contract Code 4107 . . . subsections 4107 paragraphs 2 and 4" as the reasons for substituting Zephyr: subcontractor has become insolvent or failed to provide a bond.[3]

---

[3] West Coast was actually referring to section 4107, subdivision (a)(2) and (4).

On April 20, 2010, the County sent a letter to Zephyr giving Zephyr five working days in which to submit written objections to West Coast's request to substitute Zephyr, the submission of which would trigger a hearing. Zephyr never received the notice. Zephyr had closed its post office box and the notice was returned to the County as undelivered and undeliverable. West Coast received a copy of the letter and knew that the notice to Zephyr had been returned undelivered. If Zephyr had known of this notice, it would have objected and requested a hearing.

**West Coast's Version of Events**

As work progressed, West Coast advanced Zephyr's net payroll, leaving the subcontractor to pay employer's taxes, union benefits, and other payroll expenses. This delayed the County's initial payment to West Coast until long after the 2009 work had been completed.

In late 2009 Freidus met with Andy and disclosed some of Zephyr's financial problems. Andy worried that Zephyr might not be capable of completing the Project and might not survive during the scheduled winter shutdown. Documentation provided by Freidus revealed Zephyr's debts and overhead far exceeded the amounts due to it for the work performed in 2009. With each meeting between the two, Zephyr's financial picture appeared to worsen.

In December 2009 Freidus stated Zephyr would file for bankruptcy protection, which Zephyr's attorney confirmed. On December 7, 2009, Zephyr's workers' compensation insurance was canceled for nonpayment of the premium. As a result, the Contractors State License Board suspended Zephyr's license in January 2010.

When West Coast received the initial progress payment from the County on December 7, 2009, it knew the subcontractor was failing and that Zephyr's failure to pay its Project-related bills would damage West Coast. West Coast also received notice from vendors and unions that Zephyr was not paying its bills. Zephyr and West Coast met to discuss whether the contractor would release payments to the subcontractor.

10

Subsequently, West Coast cut two checks: one for $23,528.04 to the Operating Engineers Trust Funds and Cruz Excavating, and one for $29,476.44 to the CA 185 Laborers Union and Cruz Excavating. West Coast intended to send the checks to the respective unions but learned Zephyr was attempting to burden the Project with obligations arising from other work.

Prior to receiving the first progress payment from the County, West Coast advanced Zephyr's net payroll. The increased costs of substituting Zephyr exceeded the amount Zephyr claimed due for work it had performed.

On December 31, 2009, West Coast received the County's second progress payment. Instead of paying Zephyr, West Coast withheld the funds and started paying claims from Zephyr's vendors, employees, and unions. Freidus understood the reason for withholding the funds.

In the first six months of 2010 West Coast paid $34,347.90 in claims from Zephyr's vendors and employees, including payroll checks that had been returned for insufficient funds and union contributions. The County withheld $158,000 from West Coast's final payment because Zephyr had failed to pay its unions.

In January 2010 the Internal Revenue Service recorded a $110,094 lien against Zephyr for failure to pay payroll taxes. The following month, a vendor obtained a judgment against Zephyr for $24,642 plus attorney fees and costs, and Zephyr lost its licensing bond. Zephyr's California license had already been suspended for failure to maintain workers' compensation insurance. Various Nevada state agencies also obtained judgments against Zephyr.

According to Freidus, Zephyr ceased operations on December 7, 2009, and had no work after that date. Freidus decided to file for bankruptcy, testifying: "I was talking about a reorganization of our debt to potentially renegotiate with all my creditors. So going into a Chapter 11 bankruptcy gives a little guy like me some leverage against these big creditors. Otherwise I don't have any. . . ."

11

By February 13, 2010, Freidus realized West Coast was going to terminate and substitute Zephyr. On March 4, 2010, West Coast formally requested evidence from Zephyr that it had the financial ability to continue work on the Project, that it had a valid contractor's license bond, and that it had a valid workers' compensation certificate. Zephyr received the letter but never complied with West Coast's requests.

West Coast terminated the subcontract agreement with Zephyr on March 11, 2010. West Coast sent the termination letter to Zephyr at P.O. Box 3269, Incline Village, Nevada. Freidus signed the certified mail receipt for the termination letter and did not object to the termination. On March 17, 2010, Freidus told West Coast that "Zephyr will be filing a chapter 7 bankruptcy petition in the next 4-6 weeks." After West Coast confirmed Freidus had received its termination letter, it informed the County of the termination and requested substitution of McQueary as the subcontractor.

On April 20, 2010, the County sent a notice of substitution to Zephyr at the same P.O. Box 3269 in Incline Village, Nevada, the address used by Zephyr in its original bid and the post office box listed on its contractor's license. The letter was not returned undeliverable for an improper address. It was returned because Zephyr did not sign for or claim the letter.

**Initial Complaint**

In January 2011 Zephyr filed suit in Nevada against West Coast, alleging, among other claims, breach of written contract. Zephyr voluntarily dismissed the suit and assigned its claims to Mako.

In May 2011 Mako filed suit against West Coast and Fidelity, claiming statutory violations, breach of oral contract, and various common law claims. West Coast filed a cross-complaint against Cruz Excavating, alleging breach of subcontract and asserting a claim for indemnity. West Coast filed a first amended cross-complaint, changing the cross-defendant from Cruz Excavating to Zephyr.

Mako and Zephyr moved for summary adjudication in favor of Mako and summary judgment or, in the alternative, summary adjudication in favor of Zephyr. The court denied the motion, finding triable issues of fact as to whether Zephyr had a valid contractor's license and as to whether West Coast's unsigned form governed the parties' agreement.

**Trial**

Trial began in November 2012. Mako filed for leave to amend its complaint to allege that West Coast orally agreed to a partnership or joint venture with Zephyr. The trial court denied the motion, finding Mako failed to demonstrate why it had failed to amend sooner and that such an amendment would be highly prejudicial to West Coast. The court allowed Mako to amend its complaint to allege causes of action for breach of fiduciary duty, breach of partnership, breach of joint venture, and breach of the covenant of good faith and fair dealing.

**Motion for Nonsuit**

At the close of evidence, defendants West Coast and Fidelity moved for nonsuit on Mako's claim that West Coast violated the Act by wrongfully terminating and substituting Zephyr and that West Coast was negligent. The trial court granted the motion. The trial court denied defendants' motion for nonsuit with respect to intentional interference with prospective economic advantage and negligent interference with prospective economic advantage.

**Jury Verdict**

The jury found for Mako on its claims that West Coast violated prompt pay statutes by withholding funds from Zephyr's progress payment and of breach of oral contract, breach of implied contract, conversion, common count, breach of fiduciary duty, breach of joint venture, breach of partnership, and bad faith. The jury awarded Mako compensatory damages of $915,045. The jury found defendants acted with fraud, oppression, or malice and awarded $638,422 in punitive damages, for a total award of

13

$1,553,467. In addition, the jury ruled in favor of Zephyr on all causes of action in West Coast's cross-complaint, including the breach of contract claim, and found Zephyr's license was valid.

The jury deadlocked on Mako's claims for negligent and intentional interference with prospective economic relations. The parties submitted these claims to the trial court, which ruled against Mako. The trial court also ruled against Mako on its causes of action for unfair competition and unjust enrichment.

**Posttrial Motions**

West Coast and Fidelity moved for judgment notwithstanding the verdict and for a new trial. The trial court ruled in favor of defendants, reducing the damages to Mako to $220,045 and granting a new trial. The court observed: "As a side comment, this court notes it has never granted a motion for [judgment notwithstanding the verdict] or for new trial in the scores and scores of jury trials it has heard. This case is the exception. In the court's opinion and assessment of the evidence, the jury got it wrong this time. It appears likely the jury simply did not care for Mr. Ramirez, and it was so reflected in their verdicts. Nonetheless, the evidence does not in any way, shape or form justify a legally valid award of damages for lost profits, or for punitive damages . . . ."

Mako moved for prejudgment interest under Civil Code section 3287, subdivision (a). The trial court awarded prejudgment interest for the work actually performed by Zephyr but denied interest on the unliquidated lost profits and materials left on the site.

Mako and Zephyr moved for $904,823.55 in fees and costs. The trial court awarded $282,915 in attorney fees and $35,859.85 in costs.

The court entered judgment. The parties filed timely notices of appeal.

14

## DISCUSSION

## MAKO AND ZEPHYR'S APPEAL

Plaintiffs appeal from the trial court's granting of the judgment notwithstanding verdict on the basis that the substitution of Zephyr did not violate the Act and the resulting vacation of future lost profits and punitive damages. Mako and Zephyr argue Zephyr never received the County's notice that West Coast had requested to substitute the subcontractor. In addition, Mako and Zephyr contend a review of Zephyr's financial condition reveals it was capable of completing the Project and West Coast promised to provide financing to this end. Mako and Zephyr challenge the trial court's rulings on attorney fees and costs.

**Substitution of Zephyr**

*Standard of Review*

Code of Civil Procedure section 629 provides, in part: "The court, before the expiration of its power to rule on a motion for a new trial, . . . shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made."[4] In ruling on a motion for a judgment notwithstanding the verdict, the trial court may not reweigh the evidence or judge the credibility of witnesses but must instead read the record in the light most favorable to the jury's determination. (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.)

The trial court's power to grant a motion for judgment notwithstanding the verdict is identical to its power to grant a directed verdict. In ruling on the motion, the court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and drawing every legitimate inference in support of the judgment. The motion

---

[4] Statutes 2014, chapter 93 designated the existing paragraphs of section 629 as subdivisions (a) through (d). The text quoted here is now in subdivision (a).

may be granted only when the verdict lacks support as a matter of law. (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057-1058; see *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033.) The court may grant a partial judgment notwithstanding the verdict when a party establishes that some discrete aspect of the verdict, involving a particular cause of action or claim for damages, is either unsupported by the evidence or contrary to law. (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 314, 323.)

**The Act**

The Act provides that once the general contractor lists a subcontractor in its public works bid, the general contractor is prohibited from replacing the subcontractor except under limited circumstances and with prior approval of the public agency. (§ 4107, subd. (a).) The purpose of the Act is to protect both the public and subcontractors from the evils of bid shopping and bid peddling subsequent to the award of a contract for a public project. Under the Act, the grounds for substitution are "keyed to the unwillingness or inability of the listed subcontractor properly to perform." (*Southern Cal. Acoustics Co. v. C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 726 (*Southern Cal. Acoustics*).) If a named subcontractor is wrongfully removed or substituted, the subcontractor has a private right of action against the prime contractor to recover the benefits of the wrongfully terminated subcontract. The subcontractor can recover such damages even if the substitution is approved by the awarding authority as long as the basis for approval is unauthorized. (*Id.* at pp. 726-727; *Affholder, Inc. v. Mitchell Engineering, Inc.* (2007) 153 Cal.App.4th 510, 517-518 (*Affholder*).)

A prime contractor may only seek substitution of a listed subcontractor under certain, specified circumstances, including "[w]hen the listed subcontractor becomes insolvent or the subject of an order for relief in bankruptcy" and "[w]hen the listed subcontractor fails or refuses to meet the bond requirements of the prime contractor as set forth in Section 4108." (§ 4107, subd. (a)(2), (4).)

16

As previously noted, under section 4107, subdivision (a), prior to approval of the prime contractor's request to substitute a subcontractor, the awarding authority must give notice in writing to the subcontractor about the request to substitute. "The notice shall be served by certified or registered mail to the last known address of the subcontractor. The listed subcontractor who has been so notified has five working days within which to submit written objections to the substitution to the awarding authority. Failure to file these written objections constitutes the listed subcontractor's consent to the substitution." (§ 4107, subd. (a).)[5]

**Notice to Zephyr**

The following facts are undisputed. In March 2010 West Coast notified the County of its desire to substitute Zephyr under section 4107, subdivision (a)(2) and (4), cited above. On April 20, 2010, the County served notice by certified or registered mail to the last known address of the subcontractor. Although both West Coast and the County complied with the Act, it is also undisputed that Zephyr did not receive the notice. As a consequence, Zephyr did not file written objections to the County's notice or in any way contest the substitution. The County permitted West Coast to substitute Zephyr with another subcontractor.

*Discussion*

Mako and Zephyr argue the trial court's construction of "the Act as allowing a complete bar to a final adjudication of valuable substantive rights based solely on lack of response to [a] single mailed notice, known not to be received by the addressee, violates due process. The trial court's basis for granting nonsuit was error as a matter of law." According to Mako and Zephyr, the Act requires actual notice. In the alternative, they

---

[5] We grant Mako's request for judicial notice filed on April 28, 2014.

contend, even if Zephyr is "deemed" to have notice and consented to the substitution, any consent was procured by West Coast's wrongful and fraudulent conduct.

In arguing section 4107 requires actual notice, Mako and Zephyr analogize the substitution notification to "an initial summons in that it first gives notice of a legal proceeding that affects a party's important rights." Mako and Zephyr conclude: "The Act should be interpreted for a subcontractor who has not filed written objections as consenting to substitution only for those subcontractors who have actually received notice, or at least where there has been reasonable diligence for the party to receive notice. If the Act is not interpreted in this manner, then it is unconstitutional as depriving a party of due process."

We disagree. In *Affholder* the appellate court rejected a similar challenge to section 4107, holding: "Here, Mitchell [the defendant prime contractor] requested and obtained a determination from the district that the change order relieved it of its statutory obligations to Affholder [the plaintiff subcontractor]. Affholder did not challenge that administrative determination. It may be, as Affholder suggests, that it did not receive proper notice of Mitchell's request or of the district's determination, but any procedural requirements that might be applicable (see § 4107, subd. (a)), are the responsibility of the district, not Mitchell. [Citation.] Affholder made no attempt to challenge the administrative determination on either procedural or substantive grounds. Assuming that the determination should be construed as authorizing the 'substitution' of Affholder, Affholder failed to exhaust its administrative remedies and the propriety of the substitution must be taken as established." (*Affholder*, *supra*, 153 Cal.App.4th at pp. 521-522, fn. omitted.)

By its express terms, section 4107 only requires that the awarding authority serve notice by certified or registered mail; it does not require that the County or West Coast seek out the subcontractor to assure Zephyr knew of its right to object to the substitution. As the trial court noted: "Nor does the statute mandate that a subcontractor that has

18

closed its post office box be provided different or better notice than a subcontractor who elects to check its mail or keep its post office box open. As the court noted at the hearing on the nonsuit motion, that Zephyr did not *actually receive* the notice from Placer County was a problem of Zephyr's own making. Nor is it relevant, in the court's view, whether Freidus/Zephyr intentionally refused to pick up his certified mail, whether he inadvertently failed to do so, or whether West Coast suspected the County's letter would not be retrieved by Zephyr. What is relevant is that the legal effect of the County's compliance with the Act by mailing notice to Zephyr, and Zephyr's failure to file objections to West Coast's proposed replacement of it as a subcontractor, is clear: Zephyr's failure to file written objections '*constitutes the listed subcontractor's consent to the substitution*' [citation; italics added by trial court] and the 'propriety of the substitution must be taken as established' [citation]."

We agree with the trial court's assessment of the facts. "We must assume that in creating the procedure in section 4107, the Legislature intended that the results thereof should be binding on the parties unless found to be erroneous and set aside by a court of review." (*Interior Systems, Inc. v. Del. E. Webb Corp.* (1981) 121 Cal.App.3d 312, 318.) Here, the procedure set forth in section 4107 was fully complied with. If we were to follow Zephyr's reading of the statute, a subcontractor could ignore the administrative process outlined in the statute and pursue nonstatutory or tort claims against the prime contractor even when those claims are based on the alleged wrongful substitution of the subcontractor. Section 4107 provides a binding administrative process that precludes such claims when complied with.

However, Mako and Zephyr argue, if a subcontractor is wrongfully removed or substituted for a reason not authorized by statute, the subcontractor has a private right of action against the prime contractor to recover the benefits of the wrongfully terminated subcontractor. The subcontractor can bring an action for damages even if the substitution is approved by the awarding authority as long as the basis for the approval is

19

unauthorized.  In support, Mako and Zephyr rely on *Southern Cal. Acoustics*, *supra*, 71 Cal.2d 719.

In *Southern Cal. Acoustics*, a subcontractor submitted a telephone bid to a general contractor to install ceiling tiles on a public construction job in a school district.  The general contractor listed the plaintiff subcontractor on the bid.  The general contractor then sought permission from the school district to substitute on the ground that the plaintiff had been inadvertently listed as the subcontractor in place of the intended subcontractor.  The school district allowed the substitution.  (*Southern Cal. Acoustics*, *supra*, 71 Cal.2d at pp. 721-722.)  The Supreme Court held that the plaintiff subcontractor had a cause of action against the general contractor for violating the Act if the general contractor sought substitution for an invalid reason.  The *Southern Cal. Acoustics* court stated:  "we hold that [the Act] confers the right on the listed subcontractor to perform the subcontract unless statutory grounds for a valid substitution exist."  (*Id*. at p. 727.)  The court in *Affholder* distinguished *Southern Cal. Acoustics*, noting that in *Southern Cal. Acoustics* the substitution was made on a ground clearly unauthorized by section 4107 and not within the awarding authority's discretion.  In *Affholder*, the district had the authority to define and modify the scope of the contract bid items.  There was no evidence the district acted in bad faith.  (*Affholder*, *supra*, 153 Cal.App.4th at p. 520.)

Subsequent to *Southern Cal. Acoustics*, section 4107 was amended to state: "Failure to file these written objections constitutes the listed subcontractor's consent to the substitution."  (§ 4107, subd. (a.).)  *Affholder* also discussed *Southern Cal. Acoustics* in relation to the amendment of the Act:  "Subsequent to the decision in [*Southern Cal. Acoustics*], section 4107, subdivision (a) was amended to provide for a hearing before the awarding authority if a listed subcontractor objects to a substitution.  [Citation.]  As the statute now reads, 'Failure to file these written objections constitutes the listed subcontractor's consent to the substitution.'  (§ 4107, subd. (a.).)  In *Interior Systems,*

*Inc. v. Del E. Webb Corp.* [(1981)] 121 Cal.App.3d [312,] 317-319, the court explained that the awarding authority 'had the initial jurisdiction and authority to decide whether the facts warranted granting respondent permission to substitute. There was no challenge or effort to review that permission. As a result, the trial court was entitled to presume that [the awarding authority] obeyed the law and performed its legal duty. The unavoidable conclusion is that . . . [the originally listed subcontractor] may not maintain an action against the prime contractor.' [Citation.] 'We must assume that in creating the procedure in section 4107, the Legislature intended that the results thereof should be binding on the parties unless found to be erroneous and set aside by a court of review. Here appellant never sought such review or to otherwise properly set aside [the awarding authority's] administrative finding and determination allowing respondent to substitute. The [A]ct has created a quasi-judicial remedy in the form of a hearing before the awarding authority to determine whether proper grounds exist under the act for substitution. Thus, we have at bench a case where: "The administrative tribunal is created by law to adjudicate the issue sought to be presented to the court. The claim or 'cause of action' is within the special jurisdiction of the administrative tribunal, and the courts may act only to review the final administrative determination." ' [Citation.]" (*Affholder*, *supra*, 153 Cal.App.4th at p. 521.)[6]

Mako and Zephyr also claim that West Coast terminated Zephyr as a subcontractor on March 11, 2010, six weeks prior to the mailing of the substitution notice. According to Mako and Zephyr, West Coast's "liability for wrongful termination was fixed as of March 11, 2010, and the later substitution cannot whitewash [West Coast's] liability for tort and contract claims." In support, Mako and Zephyr rely on *Titan Electric Corp. v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 188 (*Titan*).

---

[6] Except for bracketed citations, all bracketed text added by *Affholder*.

21

In *Titan*, a general contractor petitioned under section 4107 to substitute a subcontractor. However, the general contractor replaced the subcontractor before the district had consented to the substitution. The subcontractor argued that under section 4107, subdivision (b) the district lacked the authority to consent to the substitution after another subcontractor had completed the work. (*Titan*, *supra*, 160 Cal.App.4th at p. 203.) The appellate court disagreed, finding: "Although section 4107 contemplates that the awarding authority's consent to substitution and approval of a replacement subcontractor will occur before the replacement performs the subcontract, a deviation from this procedure is valid so long as the procedure used actually complies in substance with the reasonable objectives of the statute. Here, such substantial compliance occurred." (*Titan*, at p. 203.)

In *Titan*, the subcontractor received the notices of the substitution and requested hearings. The hearings were postponed to accommodate settlement talks. Subsequently, following administrative hearings, the district granted the substitution requests. During this process, the general contractor replaced the subcontractor and the work proceeded. (*Titan*, *supra*, 160 Cal.App.4th at pp. 197-200.) The appellate court reviewed the record, found the district complied in substance with the procedural requirements of the statute, and further found no evidence of bid shopping or any other evil the statute sought to avoid. (*Id*. at pp. 204-208.) Here, the procedural requirements of section 4107 were met and Zephyr has presented no evidence of bid shopping or other irregularities at odds with the reasonable objectives of the statute. Zephyr failed to respond to the notice of substitution, which precluded any further hearings.

The trial court concluded that "[i]n this case, the procedure mandated by statute that allows for substitution of subcontractor Zephyr was engaged and followed. The results of this compliance with statute include that West Coast was permitted to substitute Zephyr based on statutorily-recognized grounds and that Zephyr's failure to object constitutes its *consent* to its substitution. These results are binding on the parties.

22

Allowing plaintiff to seek damages that *follow* the substitution to which it is deemed to have consented, despite having failed to exhaust administrative or mandamus remedies, would circumvent the purposes of the statute." The failure to pursue administrative remedies results in the administrative finding's having a binding, preclusive effect on claims involving the issue of Zephyr's substitution and replacement on the Project. The trial court's determination is supported by both the facts and the relevant legal authority.

**Punitive Damages**

The jury awarded Mako punitive damages in the amount of $638,422.00. The trial court granted a judgment notwithstanding the verdict with respect to punitive damages. Mako and Zephyr contend the court erred in vacating the punitive damages award.

Regarding punitive damages, the court found: "In this case, the court does not intend to simply reduce or lower an amount of punitive damages awardable to plaintiff, but finds that there is no legal entitlement to an award of punitive damages at all. First . . . the central component of plaintiff's claims is that it was wrongfully substituted on the Lake Forest Project and replaced by another subcontractor. This cannot serve as a basis for a finding that, in effectuating the substitution, West Coast acted with malice, oppression or fraud. This is so because the substitution of the plaintiff subcontractor by West Coast was lawful and because, by operation of statute, Zephyr consented to the substitution. What is left of the jury's verdict is its finding that West Coast breached an implied or oral contract and/or failed to make payments under the prompt payment statutes. However, as to the breach of contract findings, punitive damages may not be awarded. It is well settled that punitive damages are not available for breach of contract. [Citations.] In this case, an *arguable* independent tort is conversion of the 'materials left at the job site.' However, of the claims not eliminated by this motion, the jury found West Coast liable for materials left at the job site, in the amount of $15,000, under the alternative theories that the materials were provided pursuant to an implied or oral contract or because of conversion. The same is true with respect to the jury's finding that

23

the checks that had been endorsed jointly by West Coast and plaintiff were not signed over to plaintiff. The jury found West Coast liable for the checks under alternative theories of breach of contract or conversion. In the court's view, it would not be appropriate to allow a punitive damages award on top of the jury's award of $205,045 for 'work performed on the Lake Forest Job but not paid for by West Coast' or on top of the $15,000 the jury found owing 'for loss of equipment and materials left on the Lake Forest Job.' West Coast is not liable for those amounts because of conduct that has been found by the jury to be only [tortious], as opposed to contract-related."

Mako and Zephyr begin by challenging the trial court's ability to strike the punitive damage award without a noticed motion, briefing, or argument. Mako and Zephyr point out that defendants did not challenge the punitive damages award in the combined motion for judgment notwithstanding the verdict and for a new trial. However, Mako and Zephyr acknowledge that in a posttrial motion, defendants requested judgment be entered against Mako on punitive damages. As the trial court found in its ruling on posttrial motions, "the court is compelled to note that all of the issues raised by the motions were raised in some form before trial, during trial and, now, after trial. Neither side should claim it is surprised to see the arguments made by the other."

Mako and Zephyr argue that, as a matter of law, a finding that Zephyr was not unlawfully substituted under the Act does not bar punitive damages under other theories. According to Mako and Zephyr, the jury found West Coast liable on other claims that support punitive damages: breach of fiduciary duty, breach of joint venture, and breach of partnership. These torts, Mako and Zephyr aver, independently support an award of punitive damages. The acts supporting an award of punitive damages include West Coast's wrongfully withholding Zephyr's share of Placer County's payment for work performed, West Coast's secret plan to terminate Zephyr and put it out of business, and not forwarding union checks.

24

Civil Code section 3294 provides, in part: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) Punitive damages may not be awarded if a defendant's oppressive, fraudulent, or malicious conduct is related to or arises from the contract. (*Doyle v. Chief Oil Co.* (1944) 64 Cal.App.2d 284, 295.)

As the parties agree, a breach of contract gives rise to punitive damages only if the conduct breaches an independent tort duty. (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 61.) " 'Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently induced. [Citation.]' [Citation.]" (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 989-990.)

We agree with the trial court's assessment that the jury's punitive damages award was based on conduct that was contract related. Mako and Zephyr argue the jury found West Coast liable for breach of fiduciary duty, breach of joint venture, and breach of partnership and that "[e]ach of these breaches is a breach of an independent tort, any one of which alone would support the jury's award of punitive damages." However, Mako and Zephyr fail to explain why these torts are independent from the underlying contract between the parties.

Mako and Zephyr contend the prompt payment statutory penalty does not bar additional punitive damages. According to Mako and Zephyr, the trial court's finding to the contrary is error as a matter of law. The court determined "punitive damages are not appropriate for a violation of the prompt payment statutes because the statutes already contain a specific punitive feature - plaintiff will be entitled to recover statutory penalties

25

for West Coast's failure to timely make payments for work and materials provided by Zephyr."

The prompt payment statute includes a 2 percent per month penalty to be assessed by the court after the verdict. (Bus. & Prof. Code, §§ 7107, 7108.5; Pub. Contract Code, § 10262.5.) Mako and Zephyr characterize the statutory penalty as remedial, not punitive, quoting dicta from *Washington Internat. Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 981. ("Although we need not reach this issue, we note that the 'interest penalty' appears to be more in the nature of reimbursement . . . ." (*Id.* at p. 991, fn. 5.)

However, the rule is clear and straightforward: "a plaintiff cannot recover both punitive damages and statutory penalties, as this would constitute a prohibited double penalty for the same act." (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 912.) Awarding Mako punitive damages in addition to the damages under the prompt payment statute would punish West Coast twice.

**Trial Court's Grant of a New Trial**

Mako and Zephyr argue the trial court erred in granting, in the alternative, a new trial. In making this claim, Mako and Zephyr incorporate their arguments against the judgment notwithstanding the verdict: that "the trial court erroneously construed the Act when it held a subcontractor who does not contest the substitution is deemed to 'consent' to the substitution and that consent bars any other common law tort or contract claims against the prime contractor." We have considered Mako and Zephyr's claim and found it wanting.

**Prejudgment Interest on Damages for Lost Profits**

In a related claim, Mako and Zephyr contend the trial court erred in denying prejudgment interest on damages for lost profits on the Project. Mako and Zephyr challenge the trial court's conclusion that Zephyr's lost profits on the Project were not liquidated.

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." (Civ. Code, § 3287, former subd. (a).) "The primary purpose of an award of prejudgment interest is to compensate the plaintiff for the loss of use of money during the period before the entry of judgment, in order to make the plaintiff whole." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 919.) We review the denial of section 3287 prejudgment interest de novo. (*Tenzera, Inc. v. Osterman* (2012) 205 Cal.App.4th 16, 21.)

The trial court, in denying prejudgment interest, found: "The court determined in its ruling on defendants' motion for [judgment notwithstanding the verdict] that plaintiff is not entitled to recover for lost profits claimed on the Lake Forest Project and, therefore, prejudgment interest cannot be awarded as to this claim. Even so, the damages claimed for lost profits on the project were not liquidated. The court notes that the original complaint alleged lost profits of $548,123.10 while the First Amended Complaint alleged lost profits of $484,992. The amount of this claim could not be readily ascertained, and it took a trial and the presentation of evidence to determine the amount to which plaintiff might have been entitled, had the court not determined subsequently, as a matter of law, that plaintiff is not entitled to recover for loss of profits."

We find the trial court appropriately refused to award Mako lost profits for the Project. Therefore, the court also correctly concluded Mako was not entitled to prejudgment interest on lost profits. We need not address the question of liquidated damages.

Mako and Zephyr also claim the court erred in not awarding prejudgment interest on damages for loss of equipment and materials left on the job site. The jury awarded Mako $15,000 for damages for loss of equipment and materials; Mako and Zephyr contend Mako is entitled to prejudgment interest calculated on the principal amount of

27

$15,000 at an interest rate of 10 percent per annum from March 11, 2010, until entry of judgment.

The trial court found: "Plaintiff's request for an award of prejudgment interest on the $15,000 awarded by the jury for equipment and materials left at the Lake Forest job site is denied. Plaintiff has not shown that the materials and equipment left on the project site can be characterized as liquidated damages. Although the jury determined a value, the evidence at trial concerning the value of materials and equipment left at the job site was sketchy. These damages could not be readily ascertained. The materials consisted of miscellaneous piping, fencing materials, pine needles, rock and other items."

Mako and Zephyr argue the materials at issue included "eighteen (18) pieces of K-rail, miscellaneous pipe, miscellaneous filter fence, fencing materials, a fuel trailer, six-foot panels, approximately 100 yards of pine needles, steel plates, BMP supplies, and a variety of rock," materials capable of ascertainment by calculation. However, as the trial court noted, the value of these various components could not be readily valued and therefore were unliquidated.

**Attorney Fees**

Mako and Zephyr take issue with the trial court's award of attorney fees. According to Mako and Zephyr, the court erred in reducing their attorney fees to 35 percent of those requested.

The trial court determined Mako was the prevailing party. Mako filed a motion seeking recovery of $839,158.23 in attorney fees and $65,665.32 in costs, for a total of $904,823.55. The trial court awarded attorney fees of $282,915 and costs of $35,859.85, for a total of $318,774.85.

The trial court is the best judge of the value of professional services rendered by counsel in court. We do not disturb the trial court's decision absent an abuse of discretion. (*In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1052.) The party requesting attorney fees must show the fees were allowable, reasonably necessary to the

28

litigation, and reasonable. "Reasonable compensation does not include compensation for ' "padding" in the form of inefficient or duplicative efforts . . . .' [Citations.] 'A reduced award might be fully justified by a general observation that an attorney overlitigated a case or submitted a padded bill . . . .' [Citation.]" (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 271.) Any attorney fees inquiry begins with the "lodestar," or the number of hours reasonably extended multiplied by the reasonable hourly rate. This figure may then be adjusted, based on factors specific to the case, in order to fix the fee at the fair market value for the provided legal services. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

In determining the appropriate attorney fees, the court considered several factors. First, Mako did not prevail on the vast bulk of its claims, although Mako was free to pursue the remedies it believed applicable. However, Mako's "election to pursue a multitude of tort claims transformed a relatively straight-forward case into an expensive, time-consuming litigation, ultimately requiring determination of sixteen causes of action. By far, the vast bulk of time spent on this case is attributable to litigation of Mako's unsuccessful tort claims. Simply put, from the court's perspective, the case was over-litigated. The mole hill here was West Coast's untimely payment under the prompt payment statutes - from which Mako attempted to make a mountain consisting of a multitude of tort claims. In this case, the court finds that the time necessary to prove non-payment by West Coast amounts to a small fraction of the total time devoted by Mako to litigating an array of claims not related to contract or statutory remedies. However, because of the manner in which plaintiff's counsel has billed, as described in defendants' oppositions, it is not possible for the court to precisely apportion fees attributable to the specific causes of action that were litigated."

Second, the court reviewed all of Mako's and Zephyr's invoices for attorney services and found the amount of time claimed not reasonable and, in many cases, excessive and duplicative: "For example, the court does not believe it reasonable to

29

charge for over 70 hours for preparation of the complaint, or another 100 or more hours drafting amendments. As a further example, the court finds expenditure of over sixty hours for preparation of a motion for attorneys' fees to be unreasonable. Many other specific examples of unreasonable charges are cited by defendants in their respective oppositions to the motion and will not be reiterated here, but have been considered by the court. Additionally, many of the charges simply appear too general or vague to be adjudged reasonable. Finally, while it is acceptable to have multiple attorneys assigned to work on plaintiff's case, it is not reasonable to unnecessarily duplicate services, which appears to be the case here in many instances." The court determined one-third of the hours claimed by Mako and Zephyr were reasonable and awarded fees based on that calculation.

Mako and Zephyr challenge the trial court's reduction of attorney fees, arguing the court erred in attempting to apportion between successful and unsuccessful claims. According to Mako and Zephyr, all its claims "are inextricably intertwined and based upon a common core of facts and related legal theories."

The court found Mako did not prevail on the majority of its claims and "transformed a relatively straight-forward case into an expensive, time-consuming litigation, ultimately requiring determination of sixteen causes of action." In determining a prevailing plaintiff's attorney fees, the extent of a plaintiff's success is a crucial factor for the court to consider. If the plaintiff prevailed on some claims but not others, the court does not award fees for time spent litigating claims unrelated to the successful claims. The court awards only that amount of fees that is reasonable in relation to the results obtained. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.)

In addition, "[A] partially prevailing party is not necessarily entitled to all incurred fees even where the work on the successful and unsuccessful claims was overlapping. [Citations.] Instead, the court must consider the significance of the overall relief obtained by the prevailing party in relation to the hours reasonably expended on the litigation and

30

whether the expenditure of counsel's time was reasonable in relation to the success achieved." (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 344.) However, the court need not apportion attorney fees when the claims for relief are so intertwined that it would be impracticable or impossible to separate counsel's billable hours into compensable and noncompensable hours. (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687.)

Here, the trial court found Mako prevailed on its claim of West Coast's withholding payment in violation of the prompt payment statute but was unsuccessful on its numerous tort claims. However, Mako and Zephyr contend West Coast's reason for not paying Zephyr for work performed was its secret decision to terminate Zephyr and use the money owed to offset expenses it anticipated to incur from the termination. Therefore, the same evidence applied to all claims and the court erred in apportioning fees.

We agree with the trial court's assessment of the facts. West Coast's failure to pay Zephyr for work it performed was a small portion of the total litigation Zephyr pursued. The subcontract in question only provides recovery of attorney fees relating to the construction or interpretation of the subcontract itself. In such a case, the court may delete time spent on unnecessary and unsuccessful claims; when a plaintiff achieves only limited success, a reduced attorney fee award is appropriate. (*Rey v. Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1238-1239.)

Mako and Zephyr also accuse the trial court of "arbitrarily slashing" the number of attorney hours by two-thirds. A court abuses its discretion, they argue, when there is no reasonable connection between the lodestar figure and the fee ultimately ordered.

Mako and Zephyr contend the court applied an "unsubstantiated" percentage of 35 percent based solely on an erroneous description of Mako and Zephyr's degree of success. Again, we disagree. The court considered the entire case and determined what percentage of the attorney fees was attributable to litigating the claim for failure to pay.

31

Finally, Mako and Zephyr allege the court abused its discretion by reducing uncontested attorney hourly rates. According to Mako and Zephyr, they submitted detailed declarations of the experience and expertise of the attorneys, their usual hourly rates, and a survey substantiating rates from their area.

"The objective starting point in the attorney fee analysis is the lodestar figure. [Citation.] The lodestar figure is calculated using the reasonable rate for comparable legal services in *the local community* for noncontingent litigation of the same type, multiplied by the reasonable number of hours spent on the case." (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1242-1243.) The trial took place in Placer County. Mako and Zephyr offered evidence of rates at large law firms in cities across the United States, not rates applicable in the local community. We cannot find the trial court abused its discretion in determining the reasonable rates for attorney services in Placer County.

**Costs**

Mako and Zephyr claim the trial court abused its discretion in reducing the amount of costs awarded. The trial court has broad discretion to allow or deny costs, and we reverse only if there is a clear abuse of discretion and a miscarriage of justice. (*Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 52.)

In essence, Mako and Zephyr echo their earlier arguments that the trial court erred in finding Zephyr "did not prevail on the bulk of its claims and that it spent the bulk of this case litigating unsuccessful tort claims." As noted, we find this argument unpersuasive and accordingly cannot find an abuse of discretion in the trial court's reduction of costs.

WEST COAST'S CROSS-APPEAL

In its cross-appeal, West Coast presents a single contention: the trial court erred in instructing on the consequences of Zephyr's failure to maintain a qualified individual. According to West Coast, Steven Cruz, designated as responsible managing officer of Cruz Excavating, disassociated himself in August 2008, which resulted in Cruz

32

Excavating's license being automatically suspended in November 2008, long before the Project began.  However, West Coast asserts the trial court's instruction to the jury made no mention of license suspension but stated the effective date of disassociation is when written notice is received at the licensing board's headquarters.  West Coast asserts this was error and requests that we reverse the judgment and award West Coast its attorney fees and costs on appeal:  "Reversal based on the licensing issue renders moot all of the issues in the appeal."

**Background**

Corporations can operate as licensed contractors only through the association of a qualified individual.  (Bus. & Prof. Code, §§ 7065, subd. (c)(3), 7068, subd. (b)(3).)  In 2008 Steven Cruz was the qualified individual or responsible managing officer (RMO) for Cruz Excavating.  On August 9, 2008, Steven Cruz sold his interest in Cruz Excavating.  In December 2008 Cruz Excavating filed its annual list of officers, directors, and registered agent with the Nevada Secretary of State.  The list added Vince Scott in place of Steven Cruz.

**Jury Instruction**

The court instructed the jury on the disassociation statute:  "The California Contractor's License Law requires that if a Responsible Managing Officer ('RMO') is no longer associated with a license, the RMO and the Licensee each have an independent duty to give written notice of the disassociation to the Contractor [*sic*] State License Board (the 'Board') as the agency that oversees contractor licensing.

"If the written notice is not made to the Board with in [*sic*] 90 days of the date of disassociation, then the effective date of disassociation is when written notice is received at the Board's headquarters.

"The RMO is responsible for the construction operations of the licensee until the date of disassociation or the date the Board receives the written notification of disassociation, whichever is later."

33

West Coast challenges the instruction, arguing: "During the course of trial, the Court concluded that the failure to give the registrar notice of disassociation, within 90 days of disassociation, does not result in the automatic suspension of the license. The Trial Court's instruction to the Jury made no reference to license suspension, and incorrectly stated that the 'effective date of disassociation is when written notice is received at the Board's headquarters.' [West Coast's judgment notwithstanding the verdict] motion requested judgment based on a correct interpretation of the statute, but that request was denied."

**The Statutory Scheme**

Business and Professions Code section 7031, subdivision (a) states, in part: "[N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person . . . ."

Business and Professions Code section 7068.2 states, in pertinent part:

"(a)  If the responsible managing officer, responsible managing employee, responsible managing member, or responsible managing manager disassociates from the licensed entity, the licensee or the qualifier shall notify the registrar in writing within 90 days after the date of disassociation. The licensee shall have 90 days after the date of disassociation in which to replace the qualifier. Upon failure to replace the qualifier within 90 days after the date of disassociation, the license shall be automatically suspended or the classification removed at the end of the 90 days.  [¶] . . . [¶]

"(c)  Upon failure of the licensee or the qualifier to notify the registrar of the disassociation of the qualifier within 90 days after the date of disassociation, the license shall be automatically suspended or the classification removed and the qualifier removed

34

from the license effective the date the notification is received at the board's headquarters office.

"(d)  The person qualifying on behalf of a licensee under [Business and Professions Code] Section 7068 shall be responsible for the licensee's construction operations until the date of disassociation or the date the board receives the written notification of disassociation, whichever is later.

"(e)(1)  Upon a showing of good cause by the licensee, the registrar may review and accept a petition for one 90-day extension to replace the qualifier immediately following the initial 90-day period described in subdivision (a) only under one or more of the following circumstances:  [¶] . . . [¶]

"(f)  Failure of the licensee or the qualifier to notify the registrar of the qualifier's disassociation within 90 days after the date of disassociation shall constitute grounds for disciplinary action."

**Discussion**

A party is entitled, upon request, to correct, nonargumentative jury instructions on every theory advanced by the party that is supported by substantial evidence.  However, the trial court is not required to give instructions that are not correct statements of the law or that are incomplete or misleading.  (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242.)

Whether an instruction correctly states the law is a question of law we review de novo.  (*Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 710, 718-719.)  However, we reverse only if it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error.  (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 691-692.)

West Coast insists that under Business and Professions Code section 7068.2 license suspension is automatic 90 days after disassociation of a qualified individual, even if the licensee fails to report the disassociation.  Therefore, the trial court erred in

35

not so instructing. West Coast comes to this conclusion after a rather tortured reading of section 7068.2, subdivisions (a) and (c); we are not persuaded.

Business and Professions Code section 7068.2, subdivision (a) applies when notice of disassociation by a qualifier or licensee notifies the registrar within 90 days of disassociation. At that point the licensee has 90 days to replace the qualifier. If replacement does not take place within 90 days, "the license shall be automatically suspended."

In contrast, subdivision (c) of Business and Professions Code section 7068.2 applies when, as in the present case, the licensee or qualifier fails to notify the registrar of the disassociation within 90 days. In this situation "the license shall be automatically suspended or the classification removed and the qualifier removed from the license *effective the date the notification is received at the board's headquarters office.*" (*Ibid.*, italics added.) In addition, subdivision (f) of section 7068.2 states that failure of the licensee or qualifier to notify the registrar within 90 days of disassociation "shall constitute grounds for disciplinary action."

West Coast contends the automatic 90-day suspension described in subdivision (a) of Business and Professions Code section 7068.2 also applies in subdivision (c) of that section. The wording of what is now subdivision (c) supported this interpretation: "If the licensee or his responsible managing officer or responsible managing employee qualifying for the license or classification fails to notify the registrar in writing or replace the qualifier within 90 days, the license shall be automatically suspended or the classification removed *retroactively to 90 days from the date of disassociation.*" (Stats. 1984, ch. 1174, § 3, p. 4017, italics added.) However, in 1987 the Legislature deleted "retroactively to 90 days from the date of disassociation" and added the current language. (Stats. 1987, ch. 930, § 5, p. 3139; § 7068.2, subd. (c).) The same 1987 amendment added the language now found in subdivision (f).

West Coast also attempts to distinguish the provisions of Business and Professions Code former section 7083.  Former section 7083 states:  "All licensees shall notify the registrar, on a form prescribed by the registrar, in writing within 90 days of any change to information recorded under this chapter.  This notification requirement shall include, but not be limited to, changes in business address, personnel, business name, qualifying individual bond exemption pursuant to [Business and Professions Code] Section 7071.9, or exemption to qualify multiple licenses pursuant to [Business and Professions Code] Section 7068.1.

"Failure of the licensee to notify the registrar of any change to information within 90 days shall cause the change to be *effective the date the written notification is received at the board's headquarters office.*

"Failure to notify the registrar of the changes within the 90 days is grounds for disciplinary action."  (Italics added.)  The court instructed the jury with a variation of former section 7083; West Coast does not object to this instruction.

West Coast argues Business and Professions Code former section 7083 is irrelevant:  "Whether Zephyr violated its Section 7083 obligation to provide the CSLB [Contractors State License Board] with notice so the CSLB could update its own records is irrelevant.  Whether the CSLB could have instituted disciplinary proceedings against Zephyr for its violation of Section 7083 is irrelevant."  However, the very information former section 7083 covers, a change in personnel—in this case Cruz—and a change in qualifying for multiple licenses under Business and Professions Code section 7068.1—in this case the change in qualifying for multiple licenses from Cruz's sale of his stock—are at issue here.  The trial court did not err in instructing the jury pursuant to Business and Professions Code section 7083.

37

**DISPOSITION**

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


                                                      _____RAYE_____, P. J.


We concur:


_____NICHOLSON\_\_\_\_\_, J.


_____HOCH_____, J.